IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
:
IN RE: AVANDIA MARKETING, SALES          :    MDL No. 1871
PRACTICES AND PRODUCTS LIABILITY    :    07-md-01871
LITIGATION                                              :
_____  :
:
THIS DOCUMENT APPLIES TO:               :
:
Collier v. GlaxoSmithKline                         :    11-480
Ezell v. GlaxoSmithKline                           :    11-482
_____  :

MEMORANDUM OPINION

**RUFE, J.**                                                                                                   June 17, 2016

Before the Court is ATG's Motion for Indemnification from Michael Greer and Greer Russell, Dent, & Leathers PLLC (collectively "Greer"). ATG claims it is entitled to contribution, common law indemnification, and/or indemnification based upon unjust enrichment.

**A.      Procedural History and Findings of Fact**

In 2011, the two above-captioned lawsuits, which were filed as multi-plaintiff cases alleging product liability claims against GlaxoSmithKline ("GSK"), were transferred to the Avandia MDL from the Northern District of Mississippi. The plaintiffs were represented by Greer. Greer also represented many other Avandia claimants, some of whom had cases filed in state court and some of whom had unfiled claims.

All claims of Greer's clients were settled pursuant to a master settlement agreement with GSK entered into in February 2012 ("MSA"). In May 2012, Greer, on behalf of these clients ("settling claimants"), and GSK entered into a Stipulation to Establish a Qualified Settlement

Fund and Appoint a Fund Administrator and Trustee ("QSF Stipulation").[1] This stipulation was approved by an order of this MDL Court.[2] Guaranty Trust Company d/b/a ATG Trust Company ("ATG") was appointed the trustee and fund administrator by the QSF Stipulation and Order.

The terms of the MSA provided that a portion of the settlement fund would be refunded to GSK if, upon evaluation of the evidence of each settling claimants' Avandia use and injury, Greer determined that a certain percentage of the settling claimants did not qualify to receive funds under the terms of the MSA.[3] As Greer's evaluation of whether individual claimants qualified to receive funds under the terms of the MSA proceeded, a dispute arose between GSK and Greer with regard to whether a portion of the money GSK had deposited into the Qualified Settlement Fund should be distributed to the settling claimants and Greer[4] or reimbursed to GSK. Greer and GSK entered into a written amendment to the MSA on August 22, 2012, which specifically acknowledged a dispute as to whether the disputed amount was to be allocated to clients or reimbursed to GSK, and provided that if the parties could not resolve the dispute by November 15, 2012, they would submit the dispute to arbitration. The parties agreed that the disputed funds ("holdback amount") would be held in the trust account, and would not be distributed, while the dispute was pending. Although the dispute was not resolved by November 15, 2012, neither party requested arbitration.

Notwithstanding the ongoing dispute, on July 26, 2013, Greer sent an electronic mail message to Mark Wahlstrom of Wahlstrom & Associates, whom Greer had retained to assist in

---

[1] Stipulation dated May 14, 2012.

[2] Order dated May 14, 2012.

[3] Greer retained a doctor, Dr. Rusty Durham, to review the claimants' medical records and certify those claimants who qualified to receive funds under the MSA.

[4] Greer's clients signed retainer agreements providing that Greer would receive, as a contingent attorney's fee, 50% of any settlement or judgment the claimant received.

2

the administration of the MSA and QSF. The subject line of the email stated: "The 'holdback' portion has been earned" and in the substance of the email, Michael Greer wrote:

> Pursuant to my Agreement with George Lehner at Pepper Hamilton we will now be able to add the "holdback" funds into our client and attorney fee distribution. I have asked Christy to make those calculations and forward attorney fee/expense regarding the holdback to you this morning for wiring. As soon as we have a resolution on MS Medicaid lien. . . we will be able for you to send additional checks to our clients and work quickly toward the finish line.[5]

A second email sent from Greer to Wahlstrom that same day read: "FINALLY we got it done!" and contained a link to a Wall Street Journal Article regarding GSK's settlement of certain Avandia suits. As had been the parties' practice throughout the administration of the MSA, Greer communicated with Wahlstrom, and Wahlstrom relayed the information to ATG, which made the requested disbursements to the claimants, Greer, and those persons and entities involved in claims administration.

On the basis of this representation from Greer, and relying upon Paragraph 18 of the QSF Stipulation, ATG authorized additional payments to the claimants and Greer. Paragraph 18 of the QSF reads:

> The Fund Administrator shall have the right to rely upon any affidavit, certificate, letter, notice, electronic mail, or other document believed by the Fund Administrator to be genuine and sufficient, and upon any other evidence believed by the Fund Administrator, in his reasonable judgment, to be genuine and sufficient, which may be provided to the Fund Administrator by GSK or [Greer].

On February 6, 2015, GSK filed an Emergency Motion in the two Greer cases filed in the MDL, seeking an order to show cause why Greer and ATG should not be held in contempt of Court for unauthorized withdrawal of funds in violation of the QSF Stipulation and Order. Greer

---

[5] ATG's Exhibit No. 5.

filed a written response on February 9, 2015, and the Court convened an emergency hearing on February 10, 2015. Because the parties (and Greer in particular) wished to conduct discovery before presenting additional evidence, the hearing was not completed at that time.

Shortly after GSK's contempt motion was filed, Greer contacted the firm's professional liability carrier, Carolina Casualty Insurance Co., asking the company to settle the claims with GSK for an amount within the policy limits, noting the likelihood that, in the absence of a settlement, the Court would enter judgment against the Greer firm and/or ATG for an amount far exceeding the policy limits, and further noting that ATG had already made a demand for the Greer firm to indemnify it and hold it harmless. The insurance carrier did not settle the dispute, nor did it agree to cover any judgment or settlement amount.[6]

On March 9, 2015, before the contempt hearing resumed, the parties entered into a confidential settlement agreement and release to resolve the issues presented in GSK's Motion ("Contempt Settlement Agreement"). The Contempt Settlement Agreement provided that Greer and ATG were jointly and severally liable to GSK. The parties jointly and severally agreed to pay a specific sum of money to GSK. The Contempt Settlement Agreement provided that: "[s]aid settlement amount is not punitive or penal in nature or the result of any sanction, but represents actual and compensatory damages owed to GSK for violations of agreements with GSK."[7] The Contempt Settlement Agreement was approved by the Court by Order dated March 24, 2015.

---

[6] On March 10, 2015, Greer filed a complaint for declaratory judgment against Carolina Insurance in Mississippi state court.

[7] Contempt Settlement Agreement, ¶1.

The Contempt Settlement Agreement specifically provided that "any dispute arising out of or relating to the Agreement, including, but not limited to any Dispute regarding the breach, termination, or validity of the Agreement, shall be determined by the MDL Court."[8]

In addition to the written Contempt Settlement Agreement, Greer testified that, before Greer agreed to sign the Contempt Settlement Agreement with GSK, he and ATG entered into an unwritten "side agreement," which provided that that ATG would pay GSK in exchange for a promissory note from Greer. As evidence of the existence of a side agreement, Greer points to an email dated March 9, 2015 in which Greer noted that it did not have money to fund a settlement with GSK, and proposed that Greer and ATG may be able to reach a side agreement, giving two options Greer would find acceptable.[9] Greer also points to an unsigned promissory note he drafted, consistent with the second of his proposed side agreements.[10] However, Greer puts forth no evidence indicating that ATG agreed to either of these proposals or that ATG agreed to accept the promissory note. The Court heard credible testimony from ATG's witnesses indicating that the parties never reached an accord because Greer offered no collateral or security to back the promissory note. The Court notes that the draft note does not indicate that the note is backed by any collateral or other security.

ATG paid the full amount owed under the Contempt Settlement Agreement, and now seeks indemnification from Greer, as Greer and his clients received the money which had been erroneously distributed. The Contempt Settlement Agreement expressly contemplates the

---

[8] Contempt Settlement Agreement at ¶10.

[9] ATG Hearing Exhibit No. 22.

[10] ATG Hearing Exhibit No. 41.

possibility that the settling parties will seek indemnity from each other regarding the settled claims.[11]

## B. Conclusions of Law

In its Motion for Indemnification, ATG asserted that it is entitled to indemnification from Greer pursuant to the following legal theories: 1) statutory contribution; 2) common law indemnification; and 3) unjust enrichment.[12] The record shows that ATG has asserted its right to seek indemnification from Greer consistently, and never waived this right or otherwise resolved the issue.

### 1. Jurisdiction & Choice of Substantive Law

As the Court has previously held, it has jurisdiction to decide ATG's motion for indemnification as against Greer.[13]

The parties agree that, pursuant to the relevant terms of the MSA and Contempt Settlement Agreement, Delaware's substantive law applies to the issues raised in ATG's motion.

### 2. Greer and ATG are Jointly and Severally Liable Pursuant to the Contempt Settlement Agreement

Greer and ATG together entered into the Contempt Settlement Agreement to settle GSK's claims against them. The Court holds that Greer and ATG intended that the payment obligation under the Contempt Settlement Agreement would be a joint and several one, and the

---

[11] Contempt Settlement Agreement at ¶8.

[12] ATG's Motion for Indemnification also asserted a contractual indemnification claim against the participating Avandia claimants represented by Greer, based upon an indemnification clause set forth in the QSF Stipulation. However, the Court subsequently ruled that ATG cannot seek indemnification from the individual claimants by motion in these actions, but must file new complaints against those claimants in an appropriate forum. Order dated March 16, 2016. In briefing submitted after the Court issued that ruling, ATG has not asserted a claim for contractual indemnification as against Greer. Accordingly, the Court will not address Greer's arguments regarding contractual indemnification herein. For the same reason, Greer's Motion for Summary Judgment [Doc. No. 61] will be dismissed as moot insofar as it addresses this argument.

[13] See Order dated March 16, 2016.

Contempt Settlement Agreement states that the parties are jointly and severally liable for the settlement amount.[14]

### 3. No Side Agreement was Reached

Greer also testified that he entered into an informal side agreement with ATG, establishing a plan for ATG to pay a certain sum of money to GSK, pursuant to the Contempt Settlement Agreement, in exchange for Greer's unsecured promise to repay approximately half of that sum to ATG at some unspecified later time. No such agreement was ever committed to writing, nor incorporated into the Contempt Settlement Agreement. ATG denies having agreed to such a plan, and there is no evidence that either of Greer's offered side agreements was ever accepted by ATG. While the Court heard evidence that Greer proposed a side agreement, and even took affirmative steps with regard to the proposed agreement (drafting a promissory note, that was never executed), the Court holds that an integrated and enforceable contract was never formed. As ATG did not enter into a side agreement pursuant to which it assumed the liability to fully fund the contempt settlement in exchange for a promissory note from Greer, the Court holds that the only binding agreement at issue is the Contempt Settlement Agreement, in which ATG and Greer agreed to be held jointly and severally liable to GSK.

Based upon the evidence before the Court, the Court cannot find that ATG and Greer entered into an enforceable side agreement. Therefore, the Court must look to common law and statutory theories to determine whether Greer must indemnify or make a contribution to ATG, which fully funded the Contempt Settlement Agreement with GSK.

---

[14] ATG alone agreed to pay to GSK a certain sum towards satisfaction of the attorneys' fees incurred by GSK in the contempt matter. However, the parties agreed to be jointly and severally liable for the amount GSK sought as compensation for the improperly distributed holdback funds.

7

4.   Common Law Indemnity

ATG first argues that Greer has a common law obligation to indemnify ATG for all of the losses ATG suffered. Greer argues that ATG's own active negligence bars any claim for common law indemnification. In response, ATG argues that it was not negligent, but also points to Delaware case law which provides, in relevant part, that common law indemnification may be available to a joint tortfeasor "where the one seeking indemnity has incurred liability merely because of the failure, even though negligent, to discover or prevent the misconduct of the one sought to be charged."[15] The Superior Court of Delaware has recognized that "the right of indemnity between passive and active tortfeasors does have common law origins."[16] Generally, this exception will apply when "the one seeking indemnity has incurred liability by an action at the direction, in the interest of, and in reliance upon the one sought to be charged."[17]

Here, the Court will assume without deciding that Greer and ATG are both tortfeasors.[18] The Court heard credible evidence that Greer affirmatively misrepresented to ATG that Greer had received permission from GSK to distribute the holdback funds, and directed ATG to withdraw the funds from the bank and distribute the funds to Greer and the claimants. Greer intended and understood that ATG would rely upon this communication, in accordance with the QSF Stipulation and Order and the course of dealing between the parties. Thus, Greer was the active tortfeasor in this case. ATG relied upon Greer's communication, assuming that Greer's representation regarding GSK's consent was truthful based upon their course of dealing and

---

[15] *Ianire v. Univ. of Del.*, 255 A.2d 687, 692 (Del. Super. 1969).

[16] *Id.* at 693; *see also Lagrone v. American Mortell Corp.*, 2008 WL 4152677, * 8 (Del. Super. Ct., Sept. 4, 2008) (also holding that Delaware and Pennsylvania laws are in accord on this point).

[17] *New Zealand Kiwifruit Marketing Bd. v. City of Wilmington,* 825 F. Supp. 1180, 1193 n. 8 (D. Del. 1993).

[18] Because the underlying claims filed by GSK were settled without any factual or legal findings, the Court will not reach the merits of GSK's claims regarding the liability of the parties. As the parties agreed to be held jointly and severally liable, the Court will assume without deciding that both parties were negligent.

Greer's position as an officer of the court. Under the terms of the QSF Stipulation, ATG understood that it was permitted to rely upon electronic mail messages provided by either GSK or Greer. Greer, an officer of the Court, represented to ATG, by email, that GSK had agreed that ATG could release the holdback funds to Greer and his participating claimants. There is no evidence that ATG would have released the funds in the absence of the communication from Greer that represented that GSK had authorized the release of the funds. Thus, although the Court assumes without deciding that ATG was negligent, it nevertheless holds that ATG was at most a passive tortfeasor in this case.[19] Thus, the Court holds that Greer owes a common law duty of indemnification to ATG.

Greer also argues that ATG waived any right to seek indemnification by voluntarily paying the amount for which it was jointly and severally liable under the Contempt Settlement Agreement. ATG disagrees, arguing that its payment of the full amount due was not gratuitous, and that that Contempt Settlement Agreement expressly anticipated that it might later seek indemnification. ATG was a named party to GSK's contempt motion, and paying the amount due under the Contempt Settlement Agreement was necessary to avoid violating a Court order. As ATG had been told by Greer that it did not have the funds to make the payment for which it was jointly and severally liable,[20] ATG made the payment to avoid being held in contempt of court.[21]

---

[19] This case can be distinguished from *Lagrone v. American Mortell Corp.*, 2008 WL 4152677 (Del. Super. Ct. Sept. 4, 2008), relied upon by Greer, because in that case the Court held that the party seeking indemnification was defending claims that it was actively negligent. 2008 WL 4152677, * 8. Then, after settling the claims against it without a determination as to the character or degree of its fault, the party asked the court to further litigate the relative liability of various defendants to the underlying action (all of which had settled). 2008 WL 4152677, * 9. In this case, GSK's Motion distinguished the roles and wrongdoing by Greer and ATG: GSK alleged that Greer negligently misrepresented to ATG that GSK had approved the release of the holdback funds (was an active tortfeasor), whereas ATG is alleged to have negligently relied upon the misrepresentation by Greer and thus failed to prevent the injury to GSK (was a passive tortfeasor).

[20] *See, e.g.*, ATG Hearing Exhibit No. 22.

[21] Again, this case can be distinguished from *Lagrone*, 2008 WL 4152677. In *Lagrone*, the court held that Marmon had settled the underlying complaint on behalf of an affiliated entity, Fenestra, without any legal obligation

Finally, Greer argues that the economic loss doctrine precludes recovery in negligence for losses that are solely economic.[22] ATG argues that a recognized exception to this doctrine applies in this case. Specifically, Delaware law recognizes an exception where:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.[23]

The Court holds that this exception applies here because Greer clearly had a pecuniary interest in the distribution of the holdback funds (as he would receive approximately 50% of those funds), Greer failed to verify with GSK that he had permission to release the holdback funds, he inaccurately communicated to ATG that counsel for GSK had agreed that they could distribute the funds, despite a duty to provide accurate information. The Court also holds that ATG justifiably relied upon that misinformation, based upon the course of dealings of the parties, Greer's standing as an officer of the Court, and the language of the QSF Stipulation, which expressly states that ATG may rely upon an email communication from Greer alone.[24] ATG's reliance ultimately caused the economic loss to ATG.

---

to do so. As a volunteer, the court held, Marmon was not entitled to indemnity from codefendants who had settled separately. *Id.* Here, ATG and Greer jointly settled a claim brought by GSK which had asserted both Greer and ATG's liability. ATG then paid the amount that was jointly and severally owed by ATG and Greer pursuant to the Contempt Settlement Agreement and court order. The facts of this case are more similar to those in *In re American Intern. Group, Inc.*, 965 A.2d 763 (Del. Ch. 2009). In that case, the court held that if a single settlement agreement extinguished claims against multiple co-defendants, one of those defendants could sue seeking contribution or indemnification from the others.

[22] *See Del. Art Museum v. Ann Beha Architects, Inc.*, No. 06-481 (D. Del. Sept. 11, 2007).

[23] *Id.*

[24] Other documents, including the MSA and the Blocking Agreement, state that payment of allocations shall only be released by the Escrow Agent pursuant to written escrow instructions provided by *both* GSK and Greer. However, ATG was not the Escrow Agent, but the Fund Administrator. Furthermore, it is not clear whether ATG was provided with (or should have requested and reviewed) copies of the MSA and Blocking Agreement, or whether the escrow provisions in those documents applied to ATG. The Court is concerned by the apparent

Having carefully reviewed the arguments of both parties, the Court holds that ATG has a common law right of indemnification from Greer.

5. Statutory Contribution

Under Delaware law, there is also a statutory right to contribution among joint tortfeasors,[25] and the Court finds that ATG has a right to statutory contribution from Greer as well.

Joint tortfeasors are two or more parties which are jointly and severally liable for the same injury to persons or property. When a case is settled, a tortfeasor is entitled to a money judgment for contribution from a joint tortfeasor once it has, by payment, discharged the common liability or paid more than its pro rata share thereof, so long as the liability of the joint tortfeasor from which it seeks contribution was extinguished by the same settlement.[26] The Court may consider the relative degree of fault of the tortfeasors who have jointly settled claims in determining their *pro rata* shares.[27] Here, ATG paid the entire settlement amount to GSK, plus attorney's fees (for which it alone agreed to be held liable), although Greer is a joint tortfeasor who agreed to be held jointly and severally liable and whose liability was also extinguished. Thus, the Court finds that ATG is legally entitled to contribution from Greer. This provides an alternative legal basis for ordering the relief ATG requests.

---

inconsistency between these documents with regard to the permissions required to distribute funds. What is clear to the Court, however, is that Greer and ATG had a long history of dealings in which ATG distributed funds based upon a unilateral request from Greer, and Greer knew that ATG was likely to rely upon such a request.

[25] Uniform Contribution Among Tortfeasors Act, 10 Del. Code § 6301, *et seq.*

[26] 10 Del. Code § 6302.

[27] *Id.*

6. <u>Unjust Enrichment</u>

Because the Court finds that ATG is entitled to indemnification under the theories of statutory contribution and common law indemnification, it need not address the equitable remedy of unjust enrichment. However, the Court believes that ATG would also be entitled to indemnification under an unjust enrichment analysis, and therefore it sets forth its analysis herein.

Under Delaware law, which the parties agree applies, to assert an unjust enrichment claim, one must demonstrate: 1) enrichment by one party; 2) impoverishment by the other party; 3) a relationship between the enrichment and the impoverishment; 4) the absence of a justification; and 5) no remedy available in law. Pa. Employee Benefit Trust Fund, 710 F. Supp. 2d at 485 (D. Del. 2010).The elements are essentially the same under Pennsylvania law. *Cement Masons' Union Local 592 Pension Fund v. Fletcher*, No. 99-6132, 2000 U.S. Dist. LEXIS 18779, at *6-7 (E.D. Pa. Dec. 29, 2000). ATG likely could establish such a claim, given the facts which have been established.

Greer argues that unjust enrichment does not apply because ATG has unclean hands. The Court does not agree with this analysis. Greer argues that ATG's own negligence was a contributing cause to the improper distribution of the holdback funds. While this may be true, this argument goes to the parties' relative liability to GSK—an issue which was resolved among the interested parties, before the Court had the opportunity to make findings of fact or conclusions of law, when ATG and Greer agreed to joint and several liability under the Contempt Settlement Agreement. What this Court must now determine is whether Greer was unjustly enriched by what occurred *after* the parties entered into the Contempt Settlement Agreement.

Greer also argues that ATG has unclean hands because it breached an unwritten side agreement to seek recovery from Greer's insurance carrier, and not from Greer. As discussed above, the Court heard evidence regarding whether the parties had reached any side agreements with regard to how the Contempt Settlement Agreement would be funded. Based upon the evidence presented, the Court finds that the parties discussed the possibility that Greer's insurance carrier would cover the amount owed under the Contempt Settlement Agreement. However, the Court cannot find, based upon the evidence presented, that ATG agreed not to seek indemnification from Greer if Greer's insurance carrier denied the claim.

It is clear to this Court that Greer has been enriched by ATG's payment of the full amount due under the Contempt Settlement Agreement, because Greer received 50% of the improperly disbursed holdback funds[28] and repaid none, whereas ATG received little or no financial benefit from the disbursement, but paid to GSK the full amount for which ATG and Greer agreed to be jointly and severally liable. Greer has thus kept a large sum of money to which it was not entitled, while ATG suffered an impoverishment, because it repaid the full amount due from Greer and ATG under the Contempt Settlement Agreement. Greer provided no legal justification for refusing to pay the sum for which it agreed to be held jointly and severally liable, arguing only that, despite having received approximately half of the wrongfully disbursed funds (as well as half of the legitimately distributed MSA funds), it was unable to make any payment to satisfy the Contempt Settlement Agreement due to Greer's poor financial situation. This is not a valid defense or justification.

Greer has put forth no evidence that ATG acted in bad faith or otherwise acted with unclean hands in making a payment to GSK as required by the Contempt Settlement Agreement

---

[28] After any medical liens and administrative fees were paid, Greer's clients received the remaining funds.

and then seeking indemnification. Because Greer has been enriched by accepting but not repaying the amount improperly distributed to Greer from the holdback funds, and ATG has been impoverished in the amount of the payment to GSK pursuant to the Contempt Settlement Agreement, and because the doctrine of unclean hands does not bar recovery, the Court finds that indemnification would be proper under an equitable theory of unjust enrichment, if no legal remedy were available.

   7.  Indemnification/ Contribution Amount Owed

Because Greer and his clients received the improperly distributed holdback funds, those funds were released and distributed at Greer's direction, and ATG did not benefit financially from the release of those funds, the Court holds that Greer must pay to ATG, in indemnification or contribution, the full amount ATG paid to GSK in actual and compensatory damages for violations of agreements with GSK, pursuant to the Contempt Settlement Agreement.[29]

**C.**  **Conclusion**

For the reasons set forth herein, ATG's Motion for Indemnification will be granted, and Greer and GRDL will be required to indemnify ATG for the amount ATG paid to GSK pursuant to the Contempt Settlement Agreement. An appropriate order follows.

---

[29] ATG is not entitled to indemnification or contribution for the amount it paid to GSK towards satisfaction of GSK's attorneys' fees, as ATG agreed to be solely liable for those fees. Contempt Settlement Agreement at ¶1.